**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS KENNEY** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  20-2995** |
| | : | |
| **WATTS REGULATOR CO.** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                    **January 11, 2021**

A homeowner periodically maintaining his sixteen-year old home's plumbing but entirely unaware of the home's water pressure regulator sued the manufacturer and designer of an allegedly defective pressure regulator installed in 2002 which failed in November 2018 causing water to leak from pipes breaking off from a second floor toilet and, a couple days later, a first floor toilet. The manufacturer claims the homeowner (an aerospace engineer) overtightened fittings on the toilets' ballcock nuts causing them to fracture and dislodge the water lines connected to the toilets. The homeowner claims manufacturing and design defect in the water pressure regulator failed to stop increased water pressure to the toilets leading to the disconnected pipes and water damage. He also seeks to impose liability for failure to warn and breach of warranty.  Both sides immediately retained consultants and now experts.

The manufacturer now moves to preclude the homeowner's expert opinions and for summary judgment.  We agree the homeowner adduced no evidence of his reliance on alleged warnings nor evidence of a breach of warranty.  His expert cannot opine as to the sufficiency of warnings the homeowner never knew.  But the homeowner may proceed to trial with his expert opinions as to genuine issues of material fact, particularly causation, relating to an alleged design defect in the water pressure regulator possibly causing substantial property damage.  The factfinder will have the benefit of evaluating expert opinions in resolving what caused this loss.

## I.      Adduced Facts.[1]

Mary Elizabeth Dauphinais purchased a newly built home in 2002.[2] She later married aerospace engineer Thomas Kenney, and he moved into her home in 2011.[3] Their home has five bathrooms: three on the second floor, one on the first floor, and one in the basement.[4] The property has several appliances or fixtures through which water flows, including five toilets, two tubs, nine sinks, a dishwasher, a refrigerator with water filtration, two HVAC units, a sprinkler system, some hose bibs and a water heater.[5]

Unbeknownst to the Kenneys, their home included a 2002 Watts Series N35B ¾ inch Pressure Regulating Valve (the "Watts PRV") in the basement to regulate the water pressure flowing into the home.[6] Water pressure is measured in pounds per square inch, or "psi." The initial water pressure flowing to a residence, which the municipal water company controls, typically ranges between 80 to 150 psi.[7] The International Association of Plumbing & Mechanical Officials Uniform Plumbing Code requires homeowners to keep the water pressure in a home below 80 psi through a pressure-regulating valve.[8] The Watts PRV is designed to handle up to 400 psi of initial pressure and has an adjustment screw, which allows a homeowner to set the psi in their home within a 25 to 75 psi range.[9] Although the Watts PRV should be able to handle initial pressure levels of 400 psi, initial levels exceeding 180 psi are considered abnormally high, and a Watts PRV exposed to these levels may require additional maintenance and inspection.[10] The Watts PRV's installation and maintenance instructions advise in an outlined text box in bold and contrasting typeface, "**Annual inspection of all water system safety and control valves is required and necessary.  Regular inspection, testing and cleaning assures maximum life and proper function.**"[11] The instructions explain how to disassemble the Watts PRV, clean the strainer, replace the seat disc or diaphragm, inspect for damage, and reassemble.[12]

The instructions also provide a one-year limited warranty in a paragraph set off from the surrounding text, in contrasting type case with a bold, all-capitalized label.[13]  The limited warranty states:

> **LIMITED WARRANTY**: Watts Regulator Company warrants each product against defects in material and workmanship for a period of one-year from the date of the original shipment.  In the event of such defects within the warranty period, the Company will, at its option, replace or recondition the product without charge.  This shall constitute the exclusive remedy for breach of warranty, and the Company shall not be responsible for any incidental or consequential damages, including, without limitation, damages or other costs resulting from . . . , negligence, . . . , damage from adverse water conditions, . . . , or any other circumstances over which the company has no control. . . . THE COMPANY MAKES NO OTHER WARRANTIES EXPRESS OR IMPLIED EXCEPT AS PROVIDED IN THE LIMITED WARRANTY.[14]

No one living in the home knew of the Watts PRV's existence, nor had they ever seen, let alone read, the Watts PRV's installation and maintenance instructions.[15]  No one in the home inspected the PRV.  To Mr. Kenney's knowledge, no one ever measured the water pressure in the home before September 2018.

### Mr. Kenney's plumbing repairs.

Mr. Kenney made several plumbing repairs in his home at various points over the years. He replaced around six faucet valve seats to fix dripping sinks, about three toilet flush valves to fix running toilets, a split hose pipe to prevent water from leaking into the basement, and a corroded pipe in his water heater expansion tank also to prevent water from leaking into the basement.[16] Relevant to this litigation, Mr. Kenney replaced the valve assembly in the toilets in the powder room bathroom several months before September 2018 and the valve assembly in the second floor guest bathroom a few years before September 2018.[17]  Both toilets were fed by supply lines, which were connected to the toilet with a PEX fitting with a ballcock nut.[18] While replacing the valve assembly, Mr. Kenney at some point "snugged down" the ballcock nuts using either a channel lock

3

or a crescent wrench.[19]  Although he did not specifically measure the torque when he tightened the ballcock nuts, Mr. Kenney feels confident he did not overtighten them because, as an aerospace engineer who builds airplanes for a living, he "ha[s] experience with torque limits" and "know[s] that if you overtighten something, you'll just end up with . . . twisted threads or broken parts."[20]

In addition to making as-needed repairs, Mr. Kenney periodically performed limited routine maintenance, including winterizing the hose bibs, checking the exterior sprinkler system, and replacing the smoke alarm batteries.[21] As he did not know the Watts PRV existed, his periodic maintenance did not include inspecting the Watts PRV, nor did it include measuring the water pressure in his home.

### The Kenneys suffer water damage in September 2018.

The Kenneys spent a September 2018 day visiting their daughter at Penn State University.[22] When they arrived home about sixteen hours later, they noticed water coming down from the ceiling of the garage.[23]  Mr. Kenney told his wife to stay in the car, and he went inside.[24]  He found water pouring down everywhere, and the ceiling in the laundry room on the first floor had caved in.[25]  He went down into the basement and shut the water off at the main line.[26]  He went to the second floor to try to find the cause of the leak.[27]  He walked into the second-floor guest bathroom and saw the pipe feeding the bottom of the toilet tank was detached.[28]

Mr. Kenney called his home insurer Allstate and damage restoration company Servpro, and the Kenneys started looking for a place to stay.[29]  The Kenneys returned to their home the following two days to meet with Servpro representatives.[30]  Mr. Kenney turned on the water so they could use the other bathrooms while they were inside the home, but turned it off when they left for the evening.[31]  On the second day, the toilet in the first floor powder room failed in the

same way as the second floor toilet earlier in the week.[32]  Later investigation revealed the ballcock nuts on the first floor toilet cracked.[33]

Mr. Kenney called a plumber who came over and looked at the damage.[34]   He recommended replacing the broken parts on the two toilets.[35]  The plumber did not measure the water pressure in the home.[36]  Mr. Kenney called a second plumber.[37]  The second plumber, Toby Messere, came to the home and measured the water pressure right away.[38]  The water pressure measured at 237 psi.[39]  Noting he had seen the same problem before in the area and expressing frustration at the water company's adjustment of water pressure levels, Plumber Messere recommended Mr. Kenney install not one, but two, Watts PRVs and gauges in case the water pressure spiked again and one of the regulators or gauges failed.[40]

The home required extensive renovations after the September 2018 incident, including new flooring, new drywall, and an entirely new kitchen.[41]  Home insurer Allstate paid Mr. Kenney $280,988.87 for the damage and the Kenneys paid unspecified, but seemingly considerable, sums of money out-of-pocket.[42]

### Insurer Allstate retains Loss Consultant Zazula to study the loss.

Mr. Kenney, his home insurer Allstate, and Watts now began to examine who to blame for the loss. Allstate retained Michael Zazula, a loss consultant, to investigate and determine the root cause of the September 2018 incident.[43]  Loss Consultant Zazula worked for IEI Consulting as an engineering consultant since 2012.[44]  From 2005 to 2012, he worked as a consulting engineer for Plick and Associates, and he worked for Volkswagen from 1997 to 2004 investigating product failure issues.[45]  He performed over 2,000 forensic investigations over the past twenty years.[46]  He offered expert testimony in several state and federal cases.[47]

Loss Consultant Zazula conducted an initial site inspection on September 14, 2018.[48] He returned to the home for a second inspection on October 2, 2018, this time joined by a Watts representative.[49] During this second visit, Loss Consultant Zazula measured the water pressure, which measured at approximately 218 psi, and collected the Watts PRV, the fractured ballcock nut from the second floor guest bathroom, and the fractured ballcock nut from the first floor powder room as evidence.[50] Having collected the evidence and taken it to a controlled testing facility, Loss Consultant Zazula pressure tested and radiographed the Watts PRV with a representative from Watts and Watts's expert Stephen Pietropaolo present.[51] He pressure tested the Watts PRV by using two pressure gauges, one upstream and one downstream, and then increased the water pressure to 170 psi.[52] When he increased the inlet water pressure to 170 psi, the Watts PRV did not prevent the outlet water pressure from reaching 170 psi.[53]  At the suggestion of the Watts representative, Loss Consultant Zazula adjusted the pressure adjustment screw at the top of the PRV.[54] The adjustment had no effect.[55] Loss Consultant Zazula repeated the experiment on multiple occasions, and the results did not change—the Watts PRV did not reduce or change the water pressure.[56]

After conducting these experiments, Loss Consultant Zazula disassembled the Watts PRV.[57] With the Watts PRV disassembled, he saw significant deterioration in the disc holder, disc and O-ring sealing services.[58] He opined this deterioration prevented the Watts PRV from functioning properly.[59]

In addition to conducting these tests, Loss Consultant Zazula reviewed:  the International Plumbing Code website and standards; the International Mechanical Code website and standards; discovery documents produced; responses to discovery requests; Watts's website; the International Association of Plumbing and Mechanical Officials Uniform Plumbing Code; and other websites

and documents.[60]  He also purchased a New Old Stock Watts N35 ¾ PRV online, which came with instructions.[61]  The instructions, which were dated 2005, provided, "Note: The valve should be inspected annually to assure maximum life and performance."[62]  Loss Consultant Zazula compared these instructions to a 1997 version of the instructions Watts produced in discovery.[63]  The 1997 version states, "**Annual inspection of all water system safety and control valves is required and necessary. Regular inspection, testing, and cleaning assures maximum life and proper product function.**"[64]  Loss Consultant Zazula opines, "[c]learly there is ambiguity between the two statements," without explaining what he perceives as the "clear" ambiguity.[65]  He further states, "[t]he instructions I received in the NOS PRV do not mention to disassemble the valve to inspect it."[66]  He further critiques the 2005 instructions on the grounds they "do not provide any inspection protocol for the valve," but he explains "[t]hey do indicate how to dissemble when maintenance is necessary."[67]

### Allstate retains metallurgical engineer Craig D. Clauser.

Allstate also retained Craig D. Clauser, a registered professional engineer specializing in metallurgical engineering and materials science, to provide an expert opinion on the cause of the deterioration Loss Consultant Zazula discovered upon inspecting the Watts PRV.[68]  Engineer Clauser received a bachelor's and a master's degree in Metallurgical Engineering and Materials Science from Lehigh University and worked as an engineer since 1971.[69]  He has offered expert testimony in ten cases in the past four years,[70] including a case involving a pressure regulating valve and several cases involving ballcock supply nuts.[71]

Engineer Clauser conducted a destructive laboratory examination of the Watts PRV and the two toilet supply line nuts on October 5, 2020.[72]  He examined the Watts PRV using a Scanning Electron Microscope and conducted an Energy Dispersive Spectrometer analysis, both of which

confirmed dezincification corrosion on the Watts PRV's brass disc holder.[73]   He then visually examined the toilet supply nuts and conducted a Fournier transform infrared spectroscopy analysis, which showed the supply nuts were made of "a glass fiber strengthen Polyphenylene/Polystrene blend polymer."[74]   He also observed the nuts were fractured and showed multiple tool marks.[75] He opined "the[se] fractures have the appearance of being the result of slow crack growth (creep) driven by axial stress starting at the thread root at the base of the nuts on the inside."[76]   He continued, "[t]he axial stress at this location is the result of the tighten [sic] of the nut and water pressure against the nut base."[77]

Engineer Clauser concluded his report by finding, "the above examination of the pressure regulator disc holder confirmed the opinion of Mr. Zazula that the disc holder failed due to deterioration."[78]   He explained, "the disc holder failed by dezincification corrosion," which "compromised the disc holder and its support for the disc" resulting "in the failure of the regulator."[79]   He further explained, "[a]lternative copper alloys that are dezincification resistant were available when this regulator was manufactured and had the regulator design used such an alloy for the disc ring, this failure would not have occurred."[80]   He further opines, "[t]he failure of the pressure regulator resulted in drastically higher water pressure in the home which significantly increased the axial stress at the base of the supply line nuts which resulted in the failure of the nuts and the subsequent leak damage."[81]

### *Watts retains engineer Steven Pietropaolo.*

Watts also sought an expert opinion. Following the testing he and Loss Consultant Zazula performed together, Stephen Pietropaolo, a licensed professional engineer and the President and CEO of LGI Forensic Engineering, prepared a report for Watts.[82]

To gain a better understanding of how the Watts PRV functioned, Engineer Pietropaolo reviewed figures on the Watts website and created his own cutaway using an exemplar he purchased.[83]   Explaining how the Watts PRV functions, he explained a stem connects the regulating spring disc.[84]  He continues, "[t]he disc is the rubber component that along with the seat provides the sealing surface of the valve."[85]  He further explained, "[a]lso critical to the sealing, and proper operation of the valve to regulate water pressure is the stem "O" ring.  The stem 'O' ring seals out the water in the area where the stem goes through the bore of the body casting."[86]

Based on his understanding of how the Watts PRV functions, he explained "if the stem 'O' ring is compromised, inlet or high pressure will cross over through the bore to the underside of the diaphragm and outlet side, causing a condition where the inlet and outlet pressure will be the same (not regulated).  If the disc is compromised as was [sic] in this incident, regulated pressure cannot be accomplished because without the disc to properly seal against the seat (main sealing surface), outlet pressure can eventually become equal to the non-regulated inlet pressure when the valve is closed."[87]  He then opined, "because the disc was deteriorated and worn the subject W[atts] PRV did not regulate pressure."[88]  As the Watts PRV instructions advise homeowners to inspect the Watts PRV for damage and provides instructions on how to replace these parts, Engineer Pietropaolo opines, "[t]he WPRV did not regulate pressure because the disc deteriorated due to a lack of inspection and maintenance not due to a manufacturing defect, design defect, or failure to warn."[89]

Engineer Pietropaolo then reviewed Loss Consultant Zazula's and Engineer Clauser's reports.  He notes he "do[es] not disagree with" Loss Consultant Zazula's conclusion the disc failed due to deterioration, but he disagrees with the conclusion the disc holder contributed to the Watts

PRV failure.[90]  He disagrees with Loss Consultant Zazula's opinion regarding the ambiguity in the instructions.[91]

Engineer Pietropaolo explains his opinion regarding the disc holder in more detail in his assessment of Engineer Clauser's report.  He disputes Engineer Clauser's conclusion the disc holder failed and could not support the disc.  He explained, "[w]hile the disc holder showed evidence of pitting, the disc holder's function was not compromised."[92]  He continued, "[t]he function of the disc holder is to provide a flat rigid support to hold the disc against the seat," and "that function was not compromised by the localized pitting."[93]

### Watts retains Engineer David A. Moore.

Watts also retained professional engineer David A. Moore to analyze the Watts PRV and the two fractured ballcock nuts.[94]  From observing the Watts PRV, he also observed the presence of dezincification corrosion on the disc holder, but he determined, "the disc holder and stem are still intact and not deformed, and the support for the disc has not been compromised."[95]

Engineer Moore then analyzed the ballcock nuts.  From his visual examination, he determined, like Engineer Clauser, "[t]he ballcock nut fracture location and orientation suggest forces in the longitudinal direction (i.e. axial direction) of the nut."[96]  Also consistent with Engineer Clauser's report, Engineer Moore explained, "longitudinal force occurs when the nut is tightened onto the toilet fill valve and the bottom of the nut" and "is also generated by the water pressure acting against the portion of the cone washer inside the toilet fill valve."[97]

Performing some calculations, he determined, "a water pressure increase, even to 235 psi, would not cause creep rupture of the ballcock nut if it is properly installed."[98]  Based on the testimony Mr. Kenney used a tool on the ballcock nuts, the damage to the rubber cone washers in the ballcock nuts, and the presence of tool marks on the ballcock nuts, Engineer Moore opined,

"[t]he cause of the ballcock nut fractures and associated water leakage was over-tightening, most likely caused by Mr. Kenney tightening or re-tightening the ballcock nuts when he installed new flush valves."[99]

### *Engineer Clauser's sworn testimony.*

Engineer Clauser supplemented his report during his deposition.  He explained in more detail his opinion regarding how the dezincification on the disc holder interfered with the Watts PRV's function.  He explained, contrary to Engineer Pietropaolo's conclusion, the disc holder did more than merely provide vertical support for the disc; it also prevented lateral expansion for the disc and helped it maintain a watertight seal.[100]

Engineer Clauser also explained his review of the Watts PRV engineering drawings reveal the Watts PRV is supposed to have a disc washer made of cartridge brass.[101]  The assembly drawings show the disc washer holds the rubber disc in position in the disc holder.[102]  Reviewing the photographs of the Watts PRV, he explained the disc washer had almost completely wasted away from dezincification.[103]  He opines the dezincification corrosion on the disc washer and the disc holder helped explain the damage to the disc.[104]

Engineer Clauser also rebutted some of Engineer Moore's conclusions.  He reviewed Engineer Moore's calculations, and agreed they made sense based on Engineer Moore's assumptions, but drew a different conclusion.  He explained Engineer Moore calculated the increase in stress from added water pressure amounts to around twenty-five percent, which he determined is not significant.[105]  Engineer Clauser disputed this conclusion.  He explained, "if you look at a graph or diagram of creep life of polymers, where you plot creep life versus applied stress, a 25 percent change in the stress level gives you . . . 100 times longer creep life."  Putting his explanation in practical terms, he stated, "[f]or instance, if the nuts were going to last ten years, if

you increase the stress by 25 percent, it wouldn't be unreasonable to think they would only last about a month." [106]

## II.    Analysis

Mr. Kenney sued Watts for negligence, strict liability, and breach of warranties based on the Watts PRV's failure to prevent the spike in water pressure leading to the September 2018 incident.[107] His home insurer Allstate managed the case as subrogee. The parties conducted discovery, and each party retained experts.  Watts retained Engineer Moore and Engineer Pietropaolo, and Allstate retained Loss Consultant Zazula and Engineer Clauser.[108]

Equipped with the reports and deposition testimony, Watts and Mr. Kenney posit competing theories as to the cause of the September 2018 incident.  Mr. Kenney maintains the September 2018 incident occurred because the Watts PRV failed to regulate the water pressure in the home, and the unregulated water pressure level—which, at 237 psi, was nearly three times higher than the level recommended by the international uniform plumbing code—caused the ballcock nuts to crack over time and fail.[109]  Mr. Kenney argues this failure could have been avoided if the Watts PRV had used dezincification-resistant copper alloys in its disc washer and disc holder, rather than brass alloys.[110]  Watts argues the water pressure is a red herring, and the true cause of the incident was overtightening of the ballcock nuts, which caused them to crack over time and fail.[111]  With regard to the failure to perform properly, Watts argues the homeowners' failure to inspect and maintain the product, not any design flaw, caused the Watts PRV to stop working.[112]

Watts now moves to exclude the testimony of Engineer Clauser and Loss Consultant Zazula under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[113] and moves for summary judgment on all of Mr. Kenney's claims, arguing he failed to establish a *prima facie* case of causation or a

defective condition necessary to succeed on its strict liability, negligence and breach of warranty claims.   Watts's motion for summary judgment and its *Daubert* motion are inextricably intertwined, and we analyze the motions together.

### A.    We grant Watts's motion *in limine* under *Daubert* in part and deny in part.

In *Daubert*, the Supreme Court held Federal Rule of Evidence 702 imposes a "gatekeeping" obligation on the trial courts to "ensure that any and all scientific testimony . . . is not only relevant, but reliable."[114] Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."[115]

Our Court of Appeals has long held Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."[116] "Qualification refers to the requirement that the witness possess specialized expertise."[117] Our Court of Appeals has "interpreted this requirement liberally, holding that "a 'broad range of knowledge, skills, and training qualify an expert.'"[118] The reliability prong requires the expert's opinion be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'."[119]   The "fit" prong "requires that the expert testimony must fit the issues in the case."[120]   In other words, "the expert's testimony must be relevant for the purpose of the case and must assist the trier of fact."[121]   Our Court of Appeals instructs, "the Rules of Evidence embody a strong preference for admitting any

evidence that may assist the trier of fact" under Rule 401 generally, and Rule 702 "has a liberal policy of admissibility."[122]

1.     **Loss Consultant Zazula's opinion is admissible, except insofar as he purports to opine on ambiguities in the Watts PRV's warnings.**

Watts moves to exclude some, but not all, of Loss Consultant Zazula's testimony. Watts concedes Loss Consultant Zazula should be permitted to testify about: the fact of the ballcock nut fractures; the water pressure's measurements in the home; the Watts PRV's failure to perform as intended when tested in July 2019 and August 2020; the water pressure measurements in the home during the site visit; and the Watts PRV's compliance with applicable standards.[123]  But Watts argues Loss Consultant Zazula should not be permitted to testify about ambiguities in the Watts PRV's instructions because he is not qualified to opine on product literature and such an opinion does not "fit" the facts of this case.  Watts further argues he should not be permitted to testify the deterioration he observed on the disc holder prevented the Watts PRV from functioning as intended because "he does not explore the underlying basis for this deterioration nor does he opine why it is relevant to this matter."[124]  We agree with Watts Loss Consultant Zazula should not be permitted to testify to the ambiguities in the product's literature, but we disagree he should not be able to opine about the deterioration in the disc holder.

As the record shows no one in Mr. Kenney's home knew of the Watts PRV's existence or had ever seen or read its instructions, it is irrelevant whether the instructions were ambiguous, and expert testimony on the matter would not be helpful to a jury.  The Supreme Court in *Daubert* explained, "Rule 702 . . . requires that the evidence or testimony must assist the trier of fact to understand the evidence or to determine a fact in issue."[125]  It continued, "[e]xpert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful."[126]  When a court

resolves a claim on summary judgment, the court will not admit expert testimony relating solely to an already-decided claim.[127]

For example, in *Stagnaro v. Target Corp.*, a plaintiff asserting a negligence claim sought to establish the defendant breached a duty by introducing expert testimony regarding industry standards.[128]  Finding the testimony reliable, Judge DuBois nevertheless excluded the testimony because the plaintiff could not establish causation.[129]  As the plaintiff could not establish causation, Judge DuBois concluded, the expert's "opinions are irrelevant and fail to meet Rule 702(s) 'fit' requirement."[130]

As addressed below, Mr. Kenney cannot establish a failure-to-warn claim because no one in the household knew the Watts PRV existed or had ever seen or read the instructions.  Thus, no reasonable juror could find the ambiguity in the instructions could have caused the homeowners' injuries.[131]  As a result, Loss Consultant Zazula's testimony regarding the ambiguities or deficiencies in the instructions are irrelevant and do not satisfy Rule 702's "fit" requirement.[132]

But Loss Consultant Zazula may testify regarding the cause of the Watts PRV's failure. Loss Consultant Zazula measured the water pressure in the home, and determined the Watts PRV was not reducing pressure.  He then pressure-tested the Watts PRV offsite, and again determined the Watts PRV did not function as intended.  Under the supervision of a Watts representative and Engineer Pietropaolo and in accordance with Watts' instructions, he dissembled the Watts PRV and observed deterioration on the disc, disc holder, and O-ring.  Based on his tests and observations, which all of the experts on both sides cite and rely on in their reports, he opined the deterioration he observed caused the Watts PRV to fail.  Watts does not challenge his disassembly or the method he used to pressure test the Watts PRV, nor do they dispute his observation these

parts were deteriorated. Watts instead argues Loss Consultant Zazula does not describe specifically show how the deterioration in each component part contributed to the overall failure.

Our Court of Appeals instructs, "[a] party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross examination."[133] Loss Consultant Zazula had sufficient facts to determine the deterioration he observed caused the Watts PRV to fail. While his opinion may lack specificity regarding how each of these compromised parts contributed to the failure, Watts can highlight those weaknesses through effective cross-examination and through the adverse testimony of Engineer Moore and Pietropaolo.

### 2.      We deny Watts's motion to exclude Engineer Clauser.

Engineer Clauser's testimony is compatible with Rule 702. We deny Watts's motion to exclude him. Watts does not challenge Engineer Clauser's qualifications, his opinion's "fit" to the facts of this case, or the reliability of the methodology he used to determine the deterioration observed by Loss Consultant Zazula, Engineer Clauser, Engineer Pietropaolo, and Engineer Moore resulted from dezincification. Instead, Watts challenges the reliability of Engineer Clauser's opinions regarding the effect of the dezincification on the Watts PRV, the possibility of designing the product with dezincification-resistant copper alloys, and the cause of the ballcock nut fractures. Mr. Kenney opposes the motion, arguing Engineer Clauser provided a sufficient factual basis for his conclusions. Cognizant of our Court of Appeals' "strong preference for admitting any evidence that may assist the trier of fact" and Rule 702's "liberal policy of admissibility," we find the testimony of Engineer Clauser admissible. [134]

Engineer Clauser's testimony regarding the dezincification corrosion and its effect on the Watts PRV's function is admissible. We reiterate Watts does not challenge Engineer Clauser's

testimony regarding the presence of the dezincification corrosion on the Watts PRV, thus we find this testimony admissible on this point.  Having detected the dezincification corrosion through an unchallenged methodology, Engineer Clauser concludes, "[t]he corrosion attack compromised the disc holder and its support for the disc which resulted in the failure of the regulator."[135]  He added in his deposition, the corrosion attack also destroyed the disc washer entirely, allowing damage to the disc and preventing the disc from forming a water-tight seal.[136]

Engineer Clauser reached this conclusion by personally examining the Watts PRV, reviewing the photographs taken by Loss Consultant Zazula, and reviewing the engineering assembly drawings.[137]  He reviewed the Watts PRV's engineering assembly drawings to gain and understanding of how the product worked and formed an opinion regarding how the deteriorated disc washer and holder would affect the product's function.[138]  He also reviewed the report of Loss Consultant Zazula,[139] who tested the Watts PRV, confirmed it did not function properly, dissembled the product to investigate the source of the dysfunction, observed substantial deterioration, and opined the deterioration caused the product failure.[140]  Engineer Clauser further drew on his previous experience, which involves between 100 and 200 investigations, at least one of which involved a water-pressure regulator.[141]

Watts challenges the reliability of Engineer Clauser's testimony because he did not conduct testing to confirm his assumptions about how the deterioration caused the product to fail.  In light of the expert testimony proffered by Engineer Pietropaolo and Engineer Moore, we find Watts's reliability challenge unpersuasive.  The engineers retained by both parties employed essentially the same method of determining the cause of the product failure:  they observed the Watts PRV, they reviewed photographs, they reviewed each other's reports, and they reviewed diagrams and drawings from Watts.  Using this information, they determined how the product worked, made

their own assumptions, and drew on their experience as engineers regarding how the various deteriorated components contributed to the Watts PRV failure.  While Engineers Moore and Pietropaolo do not think the compromised disc holder contributed to the failure, Engineer Clauser disagrees.  As the Supreme Court instructs, "[t]he focus [of the *Daubert* inquiry], of course, must be solely on principles and methodology, not on the conclusions they generate."[142]  We see no basis to exclude Engineer Clauser's opinion regarding the Watts PRV failure simply because, using a nearly identical methodology to Watts' experts, he reached a different conclusion.  Watts will have the opportunity to test Engineer Clauser's conclusion by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."[143]

Engineer Clauser's testimony regarding alternative copper alloys is also admissible. Engineer Clauser testified the Watts PRV would not have failed if it had used dezincification-resistant copper alloys rather than brass alloys in the design of the PRV. As discussed above, Engineer Clauser opines the dezincification corrosion attacked critical components of the Watts PRV, specifically the disc washer and the disc holder, which prevented the Watts PRV from functioning as intended.  He opines if Watts has used dezincification resistant copper alloys the dezincification, and thus the failure, would not have occurred.  Watts challenges this testimony on the grounds Engineer Clauser did not test these alternative alloys in the Watts PRV to determine whether these alternative alloys could be susceptible to other issues, which would prevent Watts from using them.  We do not see this as a basis for excluding Engineer Clauser's testimony. Engineer Clauser is a metallurgical engineer with experience determining the appropriate alloys for use in plumbing fixtures.  He testified in the 1980s, he began advocating for sprinkler manufacturers to use dezincification-resistant copper alloys in their products, and by the year 2000, using dezincification-resistant copper alloys became the standard for sprinklers.[144]

Engineer Clauser's testimony regarding the cause of the ballcock nut fractures is also admissible. Engineer Clauser opines the ballcock nut fractures "have the appearance of being the result of slow crack growth (creep) driven by axial stress starting at the thread root at the base of the nuts on the inside."[145] He further explains, "[t]he axial stress at this location is the result of tighten [sic] of the nut and water pressure against the nut base."[146] To reach these conclusions, Engineer Clauser conducted a visual examination of the ballcock nuts and performed a Fourier infrared spectroscopy analysis to determine the strength of material. He considered the potential sources of axial stress and concluded the fractures occurred from tightening and water pressure.

Watts attacks Engineer Clauser's opinion on the grounds he did not perform the calculations necessary to quantify the extent to which water pressure and the tightening respectfully contributed to these fractures. But Engineer Clauser's deposition testimony confirms he reviewed Engineer Moore's calculations and did not disagree with them. He instead disagreed with the conclusion Engineer Moore drew from his calculations. While Engineer Moore determined the effect of the increased water pressure was insignificant in terms of causing a creep rupture, Engineer Clauser determined the effect was, in fact, significant when you take into account the increased water pressure's impact on creep life. He explains a graph of creep life of the polymers reveals the 25 percent change in the stress level Engineer Moore calculates can shorten the creep life by 100 times.

We again find the parties reached different conclusions regarding the same methodology. Both experts visually examined the ballcock nuts and drew on their experience as engineers to determine the ballcock nut fractures resulted from creep fractures caused by longitudinal axial stress. Both experts drew on their experience to explain two sources of axial stress existed: water pressure and tightening. Both experts conducted a Fournier transform infrared spectroscopy

analysis to determine the polymers and tensile strength of the ballcock nuts. Both experts agreed Engineer Moore made reasonable calculations regarding the force required to cause a creep rupture. But the engineers diverged regarding the significance of those numbers as they relate to the creep life of the ballcock nuts. Watts will have the opportunity to challenge Engineer Clauser's conclusions through vigorous cross-examination.

**B.    We deny summary judgment on the strict liability and negligence claims.**

Mr. Kenney asserts products liability claims under a strict liability theory and a common law negligence theory. "In a strict products liability action, a plaintiff must show that (1) the product was defective, (2) the defect proximately caused the plaintiff's injury, and (3) the defect existed at the time the product left the defendant's control."[147] "Three types of defective conditions give rise to a strict products liability claim: "design defects, manufacturing defects, and failure to warn defects."[148] "To prevail in a negligence action, a plaintiff must show that (1) the defendant owed a duty of care, (2) the breach of which (3) caused (4) damages."[149]

Watts seeks summary judgment arguing Mr. Kenney's strict liability and negligence claims fail as a matter of law because he has not established a *prima facie* case of a design defect or causation. [150] While we agree Mr. Kenney has not established a manufacturing or failure-to-warn defect claim, the parties adduced sufficient evidence to create a genuine issue of material fact as to whether the Watts PRV had a design defect and whether this alleged defect caused Mr. Kenney's injuries.

**1.    Mr. Kenney did not adduce evidence of a failure-to-warn.**

Mr. Kenney cannot proceed to trial on a failure-to-warn claim since no one in the home knew of the Watts PRV's existence or saw or read the instructions. "Pennsylvania recognizes strict liability for failure to warn under the Second Restatement of Torts."[151] To establish a strict

liability claim under Pennsylvania law, a "plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm."[152] In a failure to warn case, a product is defective if it "is distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product."[153] To show causation, "the plaintiff must establish that it was the total lack of a warning that was both a cause-in-fact and the proximate cause of his injuries."[154] In other words, "a plaintiff must demonstrate that he would have avoided the danger had he been warned of it by the seller."[155] "If a plaintiff fails to establish either of these two elements, then he is barred from recovery as a matter of law."[156] "To reach a jury on a failure-to-warn theory of liability, the evidence must support a reasonable inference, and not just a guess, that the existence of an adequate warning would have prevented the injury."[157]

Mr. Kenney adduced no evidence of anyone in the home reading the warning. In *Wright v. Ryobi Technologies*, Judge Dalzell granted summary judgment on a failure-to-warn claim brought by a plaintiff who had never read the manual accompanying the allegedly dangerous product.[158] Judge Dalzell explained, the plaintiff "never read the manual, and so the purported inadequacy of the warnings therein could not have caused his injury."[159] In *Flanagan v. martFIVE, LLC*, Judge Schwab granted summary judgment in a failure-to-warn case where the plaintiff testified "he '[c]hose not to look into' whether any instructions were provided on the packaging.'"[160] Given this testimony, Judge Schwab concluded no reasonable jury could find the plaintiff would have heeded additional warnings in the instructions had the manufacturer provided them, considering he did not look at the instructions at all.[161]

Watts's ability to warn Mr. Kenney of danger of a product failure is even more dubious here than in *Wright* and *Flanagan* because, not only did Mr. Kenney not see the instructions accompanying the Watts PRV, he did not know the Watts PRV existed. Given no one knew of the

Watts PRV and its instruction, the level of detail in the warning could not have prevented the injury.[162]

### 2.    Mr. Kenney did not adduce evidence of a manufacturing defect.

Mr. Kenney did not adduce evidence of a manufacturing defect.  "[A] manufacturing defect claim is essentially a claim 'that something went awry in the manufacturing process . . .  [and] the finder of fact need only compare the product that caused the injury with other products that were manufactured according to specifications."[163]  "A manufacturing defect can be established by direct evidence of a 'breakdown in the machine or a component there of' or 'or by circumstantial evidence of a product malfunction as long as Plaintiff rules out abnormal or secondary causes of the injury."[164]

Mr. Kenney did not present a theory or adduced evidence regarding a manufacturing defect. He may not proceed on a manufacturing defect claim.

### 3.    Mr. Kenney adduced evidence creating a genuine issue of fact regarding a design defect.

Mr. Kenney adduced sufficient evidence to raise a genuine dispute of material fact regarding whether the Watts PRV had a design defect and whether this defect caused Mr. Kenney's injuries.  We deny summary judgment on the strict liability and negligence claims.  There is no dispute the Watts PRV failed to perform as intended in Mr. Kenney's home in September 2018 and again later when Loss Consultant Zazula pressure tested the product on July 2019 and August 2020.  The parties instead dispute whether: (1) the Watts PRV's failure resulted from a product defect; and (2) the increased water pressure caused the ballcock nut fractures.  These genuine disputes of material fact preclude summary judgment on a design defect theory.

There is a genuine issue of fact regarding the existence of a design defect.  "To prevail on a design defect theory, plaintiffs must prove that the product is defective and that at the time it left

control of the manufacturer it lacked the feature necessary to make it safe for its intended use, or contained a feature that made it unsafe for its intended use."[165]  The Pennsylvania Supreme Court directs, "[w]hether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue."[166]

Mr. Kenney, through the testimony of Engineer Clauser, theorizes the Watts PRV's failure to use dezincification-resistant copper alloys constituted a design defect.  Watts disputes this, arguing the dezincification did not cause the product's failure.  Watts argues the product failed because Mr. Kenney and his wife failed to conduct routine inspection and maintenance on the Watts's PRV as advised in the instructions.  Reasonable minds could reach different conclusions on this issue based on the conflicting opinions.

We also find a genuine issue of fact regarding causation.  All parties agree the Watts PRV failed to perform as intended in September 2018, but the parties disagree regarding whether this failure caused the ballcock nut fractures.  Both Engineer Clauser and Engineer Moore agree the ballcock nut fractures resulted from axial stress caused by a combination of the water pressure and the tightening of the nut.  The engineers disagree regarding the extent to which each of these factors contributed to the September 2018 incident.  Faced with competing qualified testimony, we find reasonable jurors could reach different conclusions on this question.

Watts lastly argues the fact its PRV functioned for sixteen years requires us to enter summary judgment in its favor.  But contrary to Watts's assertion, there is no evidence in the record regarding the Watts PRV's performance over the past sixteen years.  As Mr. Kenney testified, no one ever tested the water pressure or inspected the Watts PRV before September 2018. Neither party offered testimony regarding the historic initial water pressures from the municipality

from 2002 to 2018. Watts's expert Engineer Moore testified, "when [the] pressure became high, we don't really know."[167] We have no evidence regarding when the Watts PRV stopped working. The fact the property had never flooded does not establish the Watts PRV had worked for sixteen years. As Watts's expert swore, "when you have something that was performing at least by all visual accounts just fine on one day and not on the next day, you either had something change or you had a progressive condition."[168] He further explained "creep cracking," which both sides agreed caused the ballcock nut fractures, occurs when "you apply stress to the part and let that stress continue, so apply constant stress to it, and over time, even though that stress may not break the part when you apply it . . . the material starts to crack . . .and then that crack can continue to grow as long as the stress is still being applied."[169] A reasonable juror could determine the Watts PRV failed several years ago, but the injury from this failure—the ballcock nuts—took several years to fully manifest.

### C.    We grant summary judgment dismissing the breach of warranty claim.

We grant summary judgment on the breach of warranty claim because the Watts PRV's express warranty expired around fifteen years before the September 2018 incident and Watts adequately disclaimed any implied warranties. Under Pennsylvania law, a manufacturer may disclaim implied warranties.[170] Section 2316 of Pennsylvania's commercial code provides:

> **(b) Implied warranties of merchantability and fitness.**--Subject to subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."
>
> **(c) Implied warranties in general.**--Notwithstanding subsection (b):

> (1) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the attention of the buyer to the exclusion of warranties and makes plain that there is no implied warranty.[171]

Watts expressly warranted the Watts PRV "for a period of one year from the date of original shipment."[172]  This warranty included a disclaimer, providing, "THE COMPANY MAKES NO OTHER WARRANTIES EXPRESS OR IMPLIED EXCEPT AS PROVIDED IN THIS LIMITED WARRANTY."[173]  As the builder installed the PRV in 2002, Watts did not breach the express one-year warranty.

Mr. Kenney then argues Watts breached the implied warranty of merchantability and fitness for a particular purpose.  We must assess whether Watts adequately disclaimed these implied warranties under Pennsylvania law.

We note, as an initial matter, Watts's disclaimer does not adequately waive the implied warranty of merchantability under subsection (b) of section 2316 because the disclaimer does not expressly mention "merchantability."  We thus must assess whether a manufacturer who fails to mention merchantability may nevertheless disclaim the implied warranty of merchantability under subsection (c) of section 2316.  As the parties have not offered authority and we have not found case law addressing this question, we look to plain language of the statute to determine its meaning.[174]

The plain language of subsection (c) demonstrates a manufacturer may disclaim the implied warranty of merchantability if it does not meet the requirements of subsection (b).  Multiple phrases in the statute support this conclusion.  First, subsection (b) is qualified by the statement "subject to subsection (c)," meaning subsection (c) overrides subsection (b).[175]  Second, subsection (c) is qualified by the statement "notwithstanding subsection (b)," also meaning subsection (c) overrides subsection (b).[176]  Subsection (c) lastly allows a manufacturer to disclaim

"*all* implied warranties," and makes no reservation for the implied warranties of merchantability or fitness.  Given this plain language, we find if Watts complied with subsection (c), it has disclaimed liability for all implied warranties, including the implied warranties of merchantability and fitness.

Watts's disclaimer complies with Section 2316(c).  Section 2316(c) provides, in relevant part, "all implied warranties are excluded by . . . language which in common understanding calls the attention of the buyer to the exclusion of warranties and makes plain that there is no implied warranty."  The language "THE COMPANY MAKES NO OTHER WARRANTIES EXPRESS OR IMPLIED EXCEPT AS PROVIDED IN THIS LIMITED WARRANTY" make plain there is no implied warranty.  This language appears in all capital letters and within the limited warranty provision, which is set off to the side, printed in a different font, and prefaced with "**LIMITED WARRANTY**" in bold, all capitalized letters. These signifiers are sufficient to call the buyer's attention to the disclaimer.[177]  Watts effectively waived all implied warranties, including the implied warranties of merchantability and fitness.  We grant summary judgment to Watts on Mr. Kenney's breach of warranty claim.

## III.   Conclusion

We grant in part and deny in part Watts's motion to exclude the testimony of Loss Consultant Zazula.  We grant Watts's motion to exclude Loss Consultant Zazula's opinion to the extent he seeks to opine on ambiguities in the Watts PRV's literature, but we deny its motion to exclude his testimony on the cause of the Watts PRV's failure.  We deny the motion on all other grounds.  We further deny Watts's motion to exclude Engineer Clauser's testimony.

We grant in part and deny in part Watts's motion for summary judgment.  We grant its motion on the manufacturing defect, failure to warn, and breach of warranty claim, but we deny its motion on all other grounds.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of a motion for summary judgment.  Watts filed a SUMF at ECF Doc. No. 28 and an appendix at ECF Doc. Nos. 29, 30, 31, and 32.  References to the Appendix are by ECF document number and the corresponding Bates number, for example, "1a."  Mr. Kenney filed an opposition to Watts' SUMF at ECF Doc. No. 39.

[2] *Id.*

[3] ECF 29-1 at 2a.

[4] *Id.* at 3a.

[5] *Id.* at 3a-4a.

[6] *Id.* at 6a; 55a.

[7] *Id.* at 59a.

[8] International Association of Plumbing Mechanical & Officials Uniform Plumbing Code § 608.2.

[9] ECF 29-1 at 58a-59a.

[10] *Id*

[11] *Id.* at 96a.

[12] *Id.*

[13] *Id.* at 116a.

[14] *Id.* at 96a.  The instructions list 1997 as the copyright year, but Watts Representative Michael Mullavey swore these are the installation instructions effective as of 2002, when the builder installed the Watts PRV.  *Id.* at 73a.

[15] *Id.* at 13a-14a.

[16] *Id.* at 4a, 9a-11a.

[17] *Id.* at 19a.

[18] *Id.* at 16a-17a.

[19] *Id.* at 18a.

[20] *Id.* at 26a.

[21] *Id.* at 10a.

[22] *Id.* at 17a.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 18a.

[28] *Id.*

[29] *Id.* at 19a.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.* at 21a.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.* at 22a.

[39] *Id.* at 26a.

[40] *Id.* at 22a.

[41] *Id.* at 23a-24a.

[42] *Id.* at 106a.

[43] *Id.* at 243a.

[44] *Id.* at 239a.

[45] *Id.*

[46] *Id.* at 238a.

[47] *Id.*

[48] *Id.* at 243a.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 243a-44a.

[52] *Id.* at 245a.

[53] *Id.*

[54] *Id.* at 245a.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.* at 256a.

[59] *Id.* at 246a.

[60] *Id.* at 244a.

[61] *Id.* at 246a.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.* at 165a.

[69] *Id.* at 161a.

[70] *Id.* at 163a-64a.

[71] *Id.* at 130a.

[72] *Id.* at 165a.

[73] *Id.*

[74] *Id.*

[75] *Id.* at 166a.

[76] *Id.* at 165a.

[77] *Id.*

[78] *Id.* at 166a.

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] ECF Doc. No. 32-1 at 488a.

[83] *See id.* at 494a-98a.

[84] *Id.* at 496a-97a.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.* at 497a.

[89] *Id.* at 504a.

[90] *Id.* at 498a.

[91] *Id.* at 499a.

[92] *Id.* at 501a.

[93] *Id.* at 501a.

94 *See* ECF Doc. No. 30-1 at 324a.

95 *Id.* at 341a.

96 *Id.* at 355a.

97 *Id.*

98 *Id.* at 355a-56a.

99 *Id.*

100 ECF Doc. No. 29-3 at 136a.

101 *Id.*

102 *Id.*

103 *Id.*

104 *Id.*

105 *Id.* at 136a.

106 *Id.*

107 ECF Doc. No. 1-2 at 5.

108 ECF Doc. No. 29 at 165a, 242a; ECF Doc. No. 30 at 324a; ECF Doc. No. 32 at 488a.

109 *See, e.g.*, ECF Doc. No. 38-1 at 8-9.

110 *Id.* at 13.

111 *See, e.g.*, ECF Doc. No. 27 at 25.

112 *Id.* at 20.

113 509 U.S. 579, 589 (1993).

114 *Id.* at 579; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

115 Fed. R. Evid. 702.

116 *Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994) (*Paoli II*) (footnote omitted)); *see also, Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008); *Calhoun v. Yamaha Motor Corp., USA*, 350 F.3d 316, 320 (3d Cir. 2003); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

[117] *Id.*

[118] *Id.* (citing *Daubert*, 509 U.S. 579).

[119] *Id.*

[120] *Id.*

[121] *Id.*

[122] *Pineda*, 520 F.3d at 243 (quoting *Kannankeril v. Terminix lnt'l, Inc.*, 128 F.3d 802, 806 (3d Cir.1997) (footnote omitted)).

[123] ECF Doc. No. 33 at 4 & n.5.

[124] *Id.* at 5.

[125] 509 U.S. at 591.

[126] *Id.*

[127] *See Stagnaro v. Target Corp.*, No. 16-3535, 2019 WL 1934871, at *9 (E.D. Pa. May 1, 2019) (finding an expert's opinions "are irrelevant" and "fail to meet Rule 702's 'fit' requirement" after concluding the plaintiff failed to prove the causation element of a negligence claim); *Resco Prods., Inc. v. Bosai Minerals Grp.*, No. 06-235, 2015 WL 5521768, at *4 n.5 (W.D. Pa. Sept. 18, 2015) ("If . . . plaintiff fails as a matter of law to prove illegal collusion at the summary judgment or trial phase, Dr. Lamb's expert opinion estimating damages will no longer "fit" this case, and his expert opinion will be excluded under Rule 702"); *Aquila v. Nationwide Mut. Ins. Co.*, No. 07-2696, 2009 WL 82499, at *2 (E.D. Pa. Jan. 9, 2009) (finding the expert testimony no longer "fit" the issues of the case following partial grant of summary judgment).

[128] *Stagnaro*, 2019 WL 1934871, at *9.

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Walker v. Gordon*, 46 F. App'x 691, 696 (3d Cir. 2002) (quoting *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).

[134] *Pineda*, 520 F.3d at 243 (quoting *Kannankeril v. Terminix lnt'l, Inc.*, 128 F.3d 802, 806 (3d Cir.1997) (footnote omitted)).

[135] ECF Doc. No. 29-3 at 166a.

[136] *Id.* at 136a.

[137] *See id.* at 126a, 134a, 136a, 141a and 165a.

[138] *Id.* at 134a-135a.

[139] *Id.* at 165a.

[140] *Id.* at 84a.

[141] *Id.* at 129a.

[142] *Daubert*, 509 U.S. at 595.

[143] *Id.* at 579.

[144] ECF Doc. No. 29-3 at 144a.

[145] *Id*. at 165a.

[146] *Id.*

[147] *Wright v. Ryobi Tech., Inc.*, 175 F. Supp. 3d 439, 449 (3d Cir. 2016).

[148] *Id.*

[149] *Id.*

[150] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[151] *Hatcher v. SCM Grp. N. Am., Inc.*, 167 F. Supp. 3d 719, 725 (3d Cir. 2016).

[152] *Id.* (citing *Riley v. Warren Mfg., Inc.*, 688 A.2d 221, 224 (Pa. Super. 1997)).

[153] *Wright v. Ryobi Tech., Inc.*, 175 F. Supp. 3d 439, 453 (E.D. Pa. 2016) (citing *Pavlik*, 135 F.3d at 881).

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.* (citing *Pavlik*, 135 F. 3d. at 881).

[158] 175 F. Supp. 3d 439.

[159] *Id.* at 455.

[160] 259 F. Supp. 3d 316, 321 (W.D. Pa. 2017).

[161] *Id.*

[162] We also doubt the alleged inadequacy of the warning provided.  The instructions warned consumers in an outlined text box containing bold text in a contrasting typeface, "**Annual inspection of all water system safety and control valves is required and necessary.  Regular inspection, testing and cleaning assures maximum life and proper product function**."  ECF Doc. No. 29 at 42a.  Above the warning, the instructions provide detailed instructions on how to clean, dissemble, inspect, and maintain the Watts PRV.  *Id.*  Mr. Kenney testified no one in the home attempted to conduct this annual inspection or maintenance.

[163] *Chandler v. L'Oreal USA, Inc.*, 340 F. Supp. 3d 551, 564 (W.D. Pa. 2018) (citations omitted).

[164] *Id.* (quoting *Smith* v. *Howmedica Osteonics Corp.*, 251 F. Supp. 3d 844, 851 (E.D. Pa. 2017)).

[165] *Thinger v. Omega Flex, Inc.*, 104 A.3d 328, 339 (Pa. 2014).

[166] *Id.*

[167] ECF Doc. No. 30-1 at 304a.

[168] *Id.*

[169] *Id.* at 305a.

[170] 13 Pa. C.S.A.§ 2316.

[171] *Id.*

[172] ECF Doc No. 29 at 42a.

[173] *Id.*

---

[174] *Allstate Life Ins. Co. v. Com.*, 52 A.3d 1077, 1080 (Pa. 2012) ("Generally, the best indication of the General Assembly's intent is the plain language of the statute.")

[175] *Legal FAQs:  Words and phrases: What do "subject to", "notwithstanding" and "without prejudice to" mean when referring to a clause in a contract*, Thompson Reuters Practical Law (Sept. 29, 2011).

[176] *Id.*

[177] *Allen-Myland, Inc. v. Garmin Intern., Inc.*, 140 A.3d 677, 688-89 (Pa. Super. Ct. 2016) ("Conspicuous terms include the following:  (i) A heading in capitals equal or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; (ii) Language in the body of a record or display in larger type than the surrounding text, in contrasting type, font or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." (citing 13 Pa.C.S.A. § 1201(b)(10)).